**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| JENNIFER M. L., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:17-cv-03362-TWP-DML |
| | ) |
| NANCY A. BERRYHILL, Deputy Commissioner | ) |
| for Operations, Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jennifer M. L. ("Claimant") requests judicial review of the final decision of the Deputy Commissioner for Operations of the Social Security Administration (the "Deputy Commissioner"), denying her applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and Supplemental Security Income ("SSI") under Title XVI of the Act.[1] For the following reasons, the Court **REMANDS** the decision of the Deputy Commissioner for further consideration.

## I.    BACKGROUND

### A.    Procedural History

On September 10, 2013, Claimant protectively filed her application for DIB, and she protectively filed her application for SSI on February 20, 2014. She alleged a disability onset date of September 10, 2013, due to anxiety, anemia, thyroid problems, stroke, impairments of the left side of her body, and chronic obstructive pulmonary disease ("COPD"). Claimant's applications

---

[1] In general, the legal standards applied are the same regardless of whether a claimant seeks Disability Insurance Benefits or Supplemental Security Income. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted decisions.

were initially denied on June 5, 2014, and again on reconsideration on September 26, 2014. Claimant filed a written request for a hearing on October 17, 2014. On March 3, 2016, a hearing was held before Administrative Law Judge Jody Hilger Odell (the "ALJ"). Claimant was present and represented by counsel, Charles D. Hankey. George E. Parsons, a vocational expert also appeared and testified at the hearing. On March 30, 2016, the ALJ denied Claimant's applications for DIB and SSI. Following this decision, on May 3, 2016, Claimant requested review by the Appeals Council. On July 24, 2017, the Appeals Council denied Claimant's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Deputy Commissioner for purposes of judicial review. On September 21, 2017, Claimant filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.**    **Factual Background**

At the time of her alleged disability onset date, Claimant was forty-four years old and she is now forty-nine years old. Claimant received a formal education through the twelfth grade, graduating from high school. She has an employment history of working as a pizza store manager, housepainter, and babysitter.

Claimant's medical records indicate that she was seeing George R. Small, Jr., M.D. ("Dr. Small"), as early as November 2011. Dr. Small was Claimant's treating primary care physician. As early as November 2011, Dr. Small noted that Claimant had orthopedic problems in her back and knees. Dr. Small also noted chronic bronchitis and chronic sinusitis and he prescribed various medications to treat Claimant's ailments. Claimant returned to Dr. Small for three-month checkup appointments throughout 2012 (Filing No. 15-15 at 9–10).

In January 2013, Claimant presented to the emergency room with complaints of slurred speech and left-sided numbness. Treatment providers noted that it looked like Claimant had an

episode of altered level of consciousness and questionable seizure. It also was noted that she had a pulmonary embolism in March 2012, but the CT scan during this hospital visit revealed no pulmonary embolism. Upon examination, Claimant was anemic and had a low potassium level, but she had no facial asymmetry and no speech problems. Claimant's lower extremities were unremarkable with no motor neurologic deficits. An MRI of her brain came back negative, and an echocardiogram also came back negative (Filing No. 15-11 at 21–27).

Claimant's hospital treatment providers opined that her left arm and left leg numbness could be from a transient ischemic attack ("TIA"), as known as a mini-stroke. They recommended a hyper-coagulation work-up, and it was noted that Claimant appeared very non-compliant with her Coumadin regimen. Upon discharge from the hospital, Claimant reported feeling better with improved nausea and vomiting. She had no left-sided weakness or numbness, no weakness or facial droop, and no edema. She was in no acute distress and had clear lungs with normal respiratory effort. *Id.*

Claimant returned to see Dr. Small in March 2013, a couple months after her visit to the hospital. She complained of pain in her right hip and guessed that the pain was the result of a recent stroke. Dr. Small opined that her hip pain was the result of osteoarthritis. She returned to Dr. Small in June and October 2013, and during those visits, Dr. Small observed Claimant's chronic bronchitis and continued to prescribe medications to her (Filing No. 15-15 at 10–11). In November 2013, Claimant had an x-ray and a CT scan taken of her pelvis. The CT scan revealed osteoarthritis of both hips, left greater than right, and L5-Sl degenerative disc changes as well as chronic bony changes (Filing No. 15-20 at 17).

In January 2014, Claimant twice presented to the hospital emergency room with complaints of chest pain, nausea, and vomiting. She had low levels of potassium. Physical examination

revealed normal findings, including with her musculoskeletal system. She was discharged from the hospital in stable condition, with prescribed medications and with instructions to follow-up with her primary care physician (Filing No. 15-15 at 12–20). In February 2014, Claimant visited Dr. Small for a hospital follow-up appointment. *Id.* at 11.

In May 2014, Dr. Small refilled Claimant's prescription medications. Claimant expressed her concern to Dr. Small about the possibility of having another blood clot form. Dr. Small talked with her about the concern and then recommended she continue with her current medications and eliminate aspirin from her regimen (Filing No. 15-21 at 39). Claimant did not return again to Dr. Small until December 2014, when she complained of intractable cough and malaise. *Id.*

In July 2014, Claimant presented to the hospital emergency room, complaining of chest pain and nausea. She was given nitroglycerin, which provided only some relief, so she also was given morphine, which provided good relief. Claimant developed acute bronchospasms after a Lexiscan was performed. She reported having a history of COPD, and her breathing improved after treatment was provided. Physical examination revealed that Claimant was anxious but alert and oriented. She had very diminished breath sounds bilaterally but no rhonchi or wheezes. The neurological examination was nonfocal with minimal left lower extremity weakness. Claimant was discharged from the hospital in stable condition, and she was able to ambulate without difficulty (Filing No. 15-18 at 29, 31, 44).

Approximately a week later, Claimant again presented to the emergency room. She complained of worsening left leg pain, back pain, and neck pain as a result of a recent car accident. She stated that she had left-sided pain secondary to a stroke but complained that her pain had gotten worse since the car accident. Her history of anxiety and COPD were noted. Upon physical examination, Claimant was fully oriented, had normal breath sounds with no wheezes or rales, and

normal musculoskeletal range of motion with no edema but with some tenderness. An x-ray of Claimant's lumbar spine showed anterolisthesis of L4 on L5, which was noted to be likely chronic. An x-ray of Claimant's cervical spine showed moderate degenerative disc disease with associated osteophyte formation from C5-C7 and disc space loss (Filing No. 15-18 at 3–7).

In May 2015, Claimant returned to Dr. Small. Dr. Small added medication to Claimant's treatment regimen to try to prevent seizures, which had become a problem for Claimant. She complained about the osteoarthritis in her hip. Dr. Small referred Claimant to another physician for a possible steroid injection. He also opined that performing hip surgery was unadvisable because of her blood dyscrasia, and they could revisit in three months the possibility of doing surgery (Filing No. 15-21 at 39).

In August 2015, an x-ray of Claimant's hips revealed severe left hip osteoarthritis with possible secondary avascular necrosis and mild flattening. It also revealed mild right hip joint space narrowing and severe left hip joint space narrowing (Filing No. 15-20 at 12). An October 2015 x-ray of Claimant's pelvis showed severe arthritic changes in the left hip, with marked joint space narrowing and osteophyte formation. *Id.* at 15.

Claimant returned to Dr. Small in August 2015 to refill her prescriptions. Dr. Small also filled out paperwork on behalf of Claimant for a driver's handicap sticker and for her DIB and SSI applications (Filing No. 15-21 at 40). Dr. Small completed a physical residual functional capacity questionnaire for Claimant's disability paperwork. He opined that Claimant was not a malingerer, and her impairment could be expected to last more than twelve months. He noted her diagnoses included coagulopathy, pulmonary embolus, stroke, and seizure disorder, with symptoms including shortness of breath with moderate exertion and stroke residuals. Dr. Small opined that Claimant frequently experienced symptoms severe enough to interfere with attention and

concentration needed to perform even simple work tasks. He opined that she was incapable of even low stress jobs as she had a poor attention span. He further opined she could walk a half a city block without rest or pain, could sit for ten minutes at a time, and could stand for five minutes at a time. Dr. Small concluded that Claimant could sit, stand, or walk for less than two hours in an eight-hour workday. She would require periods of walking about every fifteen minutes for approximately six minutes at a time and would need a job that permitted shifting positions at will from sitting, standing, or walking (Filing No. 15-18 at 58–62).

Dr. Small also opined that Claimant would not need to use a cane or other assistive device while occasionally standing or walking, and she would not need to elevate her legs during prolonged periods of sitting. She could occasionally lift less than ten pounds and frequently perform neck movements. Dr. Small opined that Claimant could frequently twist, occasionally stoop, crouch, and balance, and rarely climb ladders or stairs. He limited her reaching, handling, and fingering. She could frequently push or pull ten pounds, rarely twenty pounds, and never fifty pounds. She could tolerate less than moderate exposure to temperature extremes, noise, dust, vibration, humidity, wetness, hazards, fumes, odors, chemicals, and gases. Finally, Dr. Small opined that Claimant likely would be absent from work more than four days per month as a result of her impairments. *Id.*

In August 2015, Claimant presented to Conan Chittick, M.D. ("Dr. Chittick"). Claimant complained of left hip pain and back pain after experiencing a stroke in 2014. She also complained of gait abnormality and ongoing left-sided abnormalities with pain from her left lower back down to her foot. She reported going to physical therapy for one session but said she was unable to tolerate it because of pain, so she went to the emergency room. Upon examination, Claimant was in no acute distress and was alert and oriented. She had an antalgic gait with no hip or spine

swelling, but she did have tenderness to palpation and decreased hip range of motion. She also demonstrated a positive FABER testing, pain with axial load and Stork testing, decreased heel/toe walk on the left, and 4/5 strength in the left lower extremity. Dr. Chittick noted that x-rays showed arthritic changes of the left hip joint with decreased joint space. He recommended that Claimant receive a hip injection to help with her pain (Filing No. 15-20 at 4–7). The following day, Claimant presented to Benjamin Rase, M.D., to receive a left hip injection. There were no complications during the procedure, and Claimant reported experiencing significant improvement in her pain after the injection. *Id.* at 9–10.

Two months later, in October 2015, Claimant visited Brian Keyes, D.O. ("Dr. Keyes"), complaining of left hip pain. She told Dr. Keyes that her hip pain had increased in intensity over the past three months, and the recent hip injection had provided relief for only five to six hours. After reviewing diagnostic imaging, Dr. Keyes noted that Claimant had collapsed avascular necrosis of the left hip. Dr. Keyes discussed with Claimant the various operative and nonoperative treatment options for her hip, and Claimant agreed to undergo a hip replacement surgery (Filing No. 15-20 at 2–3).

On October 20, 2015, Claimant had a pre-operation evaluation with Bhasker Reddy, M.D. ("Dr. Reddy"). Claimant reported to Dr. Reddy that her left hip pain had increased in recent months, she had developed a limp, and she was now using a cane. Dr. Reddy considered that Claimant had been put on chronic prednisone treatment earlier in the year for COPD. Claimant reported improvement of her COPD symptoms, but she also complained of a 25-pound weight gain in two or three months, facial swelling, and increased tightness in her abdomen. Claimant told Dr. Reddy that she had not experienced nausea, vomiting, or abdominal pain recently. Claimant denied seeing a pulmonologist in the recent past but reported using a nebulizer two to

three times per day. She also reported having chronic lower back pain that was treated with Norco by her primary care physician. She reported having quit smoking about two months prior (Filing No. 15-21 at 45–47).

Upon physical examination, Dr. Reddy observed that Claimant breathed comfortably on room air, had some slight wheezing in the right base, but was otherwise clear to auscultation. Dr. Reddy observed Claimant was non-tender to palpation on her back. He noted trace lower extremity edema. Dr. Reddy recommended the hip replacement surgery be postponed due to concerns over possible Cushing's syndrome, which would increase her risk of poor wound healing and infection. He recommended that Claimant talk with her primary care physician about decreasing her corticosteroid use and also expressed doubt about some of her past diagnoses. He noted that if Claimant could be greatly weaned down or off corticosteroids and had her pulmonary regimen further addressed, it would be more reasonable to consider surgery at that point. *Id.* at 48–50.

As part of the DIB and SSI application process, Claimant underwent a consultative physical examination with Michael Gilpatrick, M.D. ("Dr. Gilpatrick"), on May 12, 2014 (Filing No. 15-17 at 51–54). Claimant reported to Dr. Gilpatrick that she had residual effects of a stroke, anxiety, asthma, COPD, short-term memory loss, left arm and leg weakness, worsening left knee pain, and bilateral hand numbness. She denied being treated by a neurologist and denied any additional seizure activity. She explained to Dr. Gilpatrick that her symptoms had been stable recently. *Id.*

Upon physical examination, Claimant was stable at station and appeared comfortable in the seated and supine positions. She followed simple and complex directions and commands without difficulty and could remember recent and remote medical events. Claimant's lung fields were clear with no wheezes or rales, she had regular heart rate and rhythm, and she had no edema. Claimant had tenderness to palpation of the spinous processes but no dorsolumbar paravertebral

muscle spasms. She had normal spinal range of motion, negative straight leg raises bilaterally, and normal lower extremity and hip range of motion with no crepitus, tenderness, or swelling. Dr. Gilpatrick observed that Claimant had a right antalgic but stable gait. Claimant was able to walk on her heels and toes, stand on either leg alone, and perform a partial squat without difficulty. Dr. Gilpatrick opined that, with the exception of the right antalgic but stable gait, Claimant had a normal physical examination. *Id.*

Also as part of the disability application process, Claimant underwent a consultative psychological evaluation with Laura E. Boggs, Psy.D. ("Dr. Boggs"), on May 27, 2014 (Filing No. 15-17 at 69–74). Claimant reported symptoms of anxiety, panic attacks, racing thoughts, fidgetiness, and compulsive behaviors. Claimant reported to Dr. Boggs, "[m]y mind tries to think about a million and one things and I get really anxious and start getting sick." *Id.* at 70. She indicated that sometimes it was controllable, but without medication, she would get sick and end up in the hospital. She stated that her primary care physician, Dr. Small, managed her psychotropic medications, which were helpful for her symptoms. *Id.*

Upon examination, Claimant had intact immediate memory and could recall two of three objects after a four-minute delay. She exhibited some difficulty with simple arithmetic and serial sevens, but she had intact insight and judgment. Dr. Boggs observed that Claimant had a limping gait and had a scared mood, responsive affect, cooperative attitude, and normal thought content and processes. *Id.* at 71–72.

Concerning her activities of daily living, Claimant reported to Dr. Boggs that she could shower and get dressed on her own, she could do the dishes with some breaks, she could do the laundry, and she could make her bed. She sometimes "messed up" on her medications, so her niece helped her with medication management. Claimant could prepare simple meals but had to

be careful around the stove. She could grocery shop in stores, and she watched television and visited with her family. Dr. Boggs diagnosed Claimant with panic disorder and opined that she would have difficulty learning, comprehending, and remembering simple instructions and performing simple tasks. *Id.* at 72–74.

## II. DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB or SSI only after she establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); Social Security Rule ("SSR") 96-8p). At step four, if the claimant can perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold

an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. <u>THE ALJ'S DECISION</u>

The ALJ first determined that Claimant met the insured status requirement of the Act through December 31, 2018. The ALJ then began the five-step sequential evaluation process. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since September 10, 2013, the alleged onset date of Claimant's disability. At step two, the ALJ found that Claimant had the following severe impairments: left hip osteoarthritis, degenerative disc disease, chronic bronchitis, COPD, anxiety, and residual effects status-post 2013 TIA. At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Claimant had an RFC to perform sedentary work with the following limitations:

> [S]he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, can never climb ladders, ropes or scaffolds, can occasionally reach overhead, can have occasional exposure to vibration and pulmonary irritants such as fumes, odors, dusts and gasses, can have no exposure to extreme cold, can never be

required to work around unprotected heights, moving mechanical parts, or be required to operate a motor vehicle, can never be required to work around slippery, uneven surfaces, can understand, remember and carry out simple, routine tasks, and can have occasional interaction with the general public, supervisors, and coworkers.

([Filing No. 15-2 at 15].)

At step four, the ALJ determined that Claimant was unable to perform her past relevant work as a babysitter, housepainter, or pizza store manager because the demands of this past work exceeded her RFC. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Claimant could perform such as surveillance system monitor, call-out operator, or inspector. Having determined that Claimant could perform work in other jobs in the economy, the ALJ determined that Claimant was not disabled. Therefore, the ALJ denied Claimant's applications for DIB and SSI because she was found to be not disabled.

## IV. DISCUSSION

In her request for judicial review, Claimant argues that the ALJ erred by conducting an insufficient evaluation regarding whether Claimant's left hip impairment met or medically equaled Listing 1.02. Claimant further argues that the ALJ's evaluation of her subjective symptoms and complaints was deficient. The Court will discuss Claimant's arguments in turn.

## A. Step 3 Analysis of Listing 1.02

Claimant asserts that the ALJ's analysis of Listing 1.02 is inadequate. She argues that the ALJ simply noted the criteria of Listing 1.02 and concluded that the Listing was not met or equaled, thereby providing no analysis at all. Claimant asserts that an ALJ must provide more than a perfunctory conclusion regarding the Listed Impairments, pointing to *Minnick v. Colvin*, 775 F.3d 929, 935–36 (7th Cir. 2015). She argues that, like in *Minnick*, the ALJ in this case inadequately dismissed her hip impairment as not meeting or equaling Listing 1.02 "in two sentences. Beyond

these two sentences, she provided no analysis whatsoever supporting her conclusion." *Id.* at 936. Claimant notes, "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

Claimant argues the record evidence supports a finding that her hip impairment met or equaled Listing 1.02, which is,

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02. Claimant explains that the medical records show a history of severe hip pain, which affects range of motion. The medical records show a diagnosis of osteoarthritis. X-rays reveal joint space narrowing and enthesophyte and osteophyte formation in the left hip. Physical examination reveals an antalgic gait with lower extremity weakness and reduced strength, and Claimant uses a cane. Claimant experienced pain and numbness radiate down to her left foot. The medical records further show severe osteoarthritis with avascular necrosis and mild flattening. Claimant was recommended for and agreed to undergo hip replacement surgery, but the surgery was postponed because of other health concerns.

Claimant asserts that none of these signs, symptoms, diagnoses, and medical records were mentioned by the ALJ in her Listing discussion. Claimant argues that any of this evidence that actually was discussed by the ALJ later in the written decision was minimized or downplayed. She argues that the ALJ ignored much of the evidence that would support disability at the Listing level consideration.

Furthermore, Claimant asserts, the ALJ did not discuss effective ambulation when considering Listing 1.02. The regulations provide a definition for effective ambulation:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00(B)(2)(b).

Claimant asserts that the Seventh Circuit directed that the non-exhaustive list of examples of ineffective ambulation should be adequately considered when determining whether a claimant can ambulate effectively. *Moss v. Astrue*, 555 F.3d 556, 562–63 (7th Cir. 2009). The Seventh Circuit explained it was erroneous for the ALJ to determine a claimant can effectively ambulate based solely on the fact that the claimant "uses just one cane" and "the medical evidence does not point to ineffective ambulation." *Id.* at 562. In remanding the case to the ALJ for further consideration, the court held that the ALJ should adequately consider the non-exhaustive list of examples of ineffective ambulation found in the regulations. *Id.* at 563.

Claimant argues there is considerable evidence in the record of her antalgic and impaired gait. Even the ALJ found that she should never be required to work around slippery, uneven

surfaces, which is an indication that the ALJ believed Claimant had an inability to ambulate effectively. She asserts there simply is no explanation why the objective findings throughout the record of instability, chronic pain, limitation of motion, and imaging of joint space narrowing fail to meet the criteria of Listing 1.02.

Claimant additionally asserts that the ALJ failed to obtain a medical opinion from a medical expert regarding whether her hip impairment could medically equal Listing 1.02, which warrants remand. *See Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Wadsworth v. Astrue*, 2008 U.S. Dist. LEXIS 55923, at *20–21 (S.D. Ind. July 21, 2008) ("ALJ erred in not seeking the opinion of a medical advisor as to whether [claimant's] impairments equaled a listing"). "The regulations discussing medical equivalence require the ALJ to consider the opinion of one or more medical or psychological consultants designated by the Commissioner when determining whether an impairment medically equals a listing." *Wadsworth*, 2008 U.S. Dist. LEXIS 55923, at *20.

Claimant argues the ALJ erred in not obtaining an expert medical opinion as to whether Claimant's impairments equaled Listing 1.02. The state agency reviewing consultants did not consider the evidence after September 26, 2014, which included many medical records showing the use of a cane and objective imaging of severe osteoarthritis with avascular necrosis, joint space narrowing, demonstrated weakness and gait abnormality, and a recommendation for total hip replacement as well as a supportive treating physician's statement.

In response, the Deputy Commissioner notes to establish presumptive disability under a Listing at Step 3, a claimant must satisfy each of the specified medical criteria of the Listing; an impairment that manifests only some of the criteria, no matter how severely, does not qualify.

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The Deputy Commissioner asserts the ALJ sufficiently stated that the medical evidence of record did not reflect a gross anatomical deformity and findings of joint space narrowing, bony destruction, or ankylosis of the affected joints resulting in an inability to ambulate effectively. The Deputy Commissioner argues that, while the Claimant pointed to objective medical findings, she has failed to point to any opinions from physicians who opined that the medical findings met or equaled the criteria of Listing 1.02. The Deputy Commissioner asserts that the ALJ supported her conclusion by referring to specific medical exhibits, namely Exhibits 5F, 8F, and 11F (*see* Filing No. 15-2 at 14).

The Deputy Commissioner argues the ALJ more fully explained her consideration of Dr. Gilpatrick's findings at Exhibit 5F and other medical records at Exhibit 8F in a subsequent section of the written decision, which provided a sufficient explanation of the substantial evidence that supported the Step 3 determination. Additionally, the Deputy Commissioner asserts the state agency physicians reviewed the earlier medical records and opined that Claimant's impairments did not meet or medically equal any Listed Impairment, thereby providing substantial evidence to support the ALJ's decision regarding medical equivalence.

The Court has carefully reviewed and considered the parties' arguments and the ALJ's written decision. At Step 3 of the ALJ's written decision, the ALJ in conclusory fashion recited the criteria of Listing 1.02 and exclaimed that the Listing was not met or medically equaled. The ALJ stated, "The medical evidence of record does not reflect a gross anatomical deformity and findings of joint space narrowing, bony destruction or ankylosis of the affected joints resulting in an inability to ambulate effectively." (Filing No. 15-2 at 14.) The ALJ then broadly references "Exs. 5F, 8F, 11F," consisting of nearly eighty pages of medical evidence, without specific citation

to particular medical records. *Id.* The ALJ provides no discussion, analysis, or rationale as to why the criteria of Listing 1.02 are not satisfied.

There is no requirement that an ALJ neatly package their decision by including a discussion of all the evidence in each section of the written decision. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *McCalip v. Berryhill*, 2018 U.S. Dist. LEXIS 113261, at *9 (S.D. Ind. July 9, 2018); *Shattuck v. Berryhill*, 2018 U.S. Dist. LEXIS 96378, at *12–13 (S.D. Ind. June 8, 2018). Yet, the ALJ "must confront the evidence that does not support her conclusion and explain why it was rejected." *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018).

In this case, the ALJ's recitation of some of the evidence—hip osteoarthritis, avascular necrosis, osteophyte formation, antalgic gait, limping gait, decreased hip range of motion, joint space narrowing, and physician's recommendation for hip replacement surgery—in the section discussing the RFC failed to build a logical bridge between this adverse evidence of possible disability and the ALJ's conclusion that Listing 1.02 was not met or medically equaled at Step 3. The ALJ did not provide any explanation regarding Claimant's ability to ambulate effectively even though the ALJ noted multiple instances from the medical record indicating an antalgic gait, a limping gait, use of a cane, and decreased range of motion in the hip.

The ALJ did not explain any analysis of how or why the adverse evidence failed to meet or medically equal the criteria of Listing 1.02. This adverse evidence (much of which was recited but not analyzed) included records of decreased hip range of motion, severe hip pain, severe arthritic changes, enthesophyte and osteophyte formations, joint space narrowing, osteoarthritis, lower extremity weakness and reduced strength, limping gait, antalgic gait, pain and numbness radiating down to the left foot, and use of a cane. The ALJ failed to explain why this evidence was rejected or was determined to be insufficient to meet or medically equal Listing 1.02. This

failure to build a logical bridge between the evidence and the conclusion that Listing 1.02 was not met or medically equaled requires remand for further consideration and explanation.

Regarding Claimant's argument for obtaining a new medical opinion concerning medical equivalence, the Deputy Commissioner ignored Claimant's argument and simply stated that the state agency physicians were the only physicians to assess medical equivalence, and they determined that Claimant's impairments did not meet or medically equal a Listed Impairment. However, Claimant did not argue that there was no medical opinion to support the ALJ's medical equivalence finding. Rather, Claimant argued that new evidence was presented as part of the record after the state agency physicians completed their assessments, and thus, a new medical opinion about medical equivalence was necessary to take into consideration the new medical evidence.

As this Court has held previously, whether it is necessary to obtain a new medical opinion about medical equivalence is a decision for the ALJ based upon if the new evidence might change the state agency consultant's opinion on equivalence. *See* SSR 96-6p, 1996 SSR LEXIS 3, at *9– 10; *Hungerford v. Berryhill*, 2018 U.S. Dist. LEXIS 129811, at *16 (S.D. Ind. July 6, 2018); *Penman v. Colvin*, 2016 U.S. Dist. LEXIS 82208, at *23 (S.D. Ind. June 23, 2016). On remand, the ALJ in this case should consider whether a new medical opinion about medical equivalence is warranted based on the medical evidence that was received in the record after the state agency consultants' review.

**B.      The ALJ's Evaluation of Claimant's Subjective Symptoms**

Because the Court already has determined that remand is appropriate based on Claimant's first argument, the Court only briefly addresses Claimant's second argument that the ALJ's evaluation of her subjective symptoms was deficient.  Claimant argues that the ALJ found that

Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. The ALJ then recited some of the medical evidence but failed to explain why Claimant's subjective symptoms were not fully credible, as required by SSR16-3p.

Relying on SSR 16-3p and *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009), Claimant argues the ALJ was required to consider a number of factors such as her daily activities, her level of pain or symptoms, aggravating factors, and medication, treatment, and limitations, and the ALJ could not simply discredit the subjective symptoms solely because there was no objective medical evidence to support them. Claimant argues this is what the ALJ did in this case; the ALJ failed to articulate any reasoning for discounting Claimant's subjective symptoms.

The Deputy Commissioner responds that an ALJ's "credibility finding" is entitled to substantial deference and will be upheld "as long as [there is] some support in the record" and it is not "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). The Deputy Commissioner asserts the ALJ gave specific reasons for her evaluation of Claimant's subjective symptoms and supported those reasons with record evidence.

In the ALJ's written decision, Claimant's subjective complaints and symptoms were considered and discussed in the context of the objective medical evidence, the RFC assessment, consultative examinations, Claimant's testimony, Claimant's function report, and a friend's third-party function report. The ALJ discussed Claimant's daily activities, her treatment, the effectiveness of medications, side effects of medications, objective medical records, and physicians' observations and opinions. The ALJ noted the weight she gave to the various evidence and provided an adequate reason for her decisions about Claimant's subjective symptoms, basing those decisions on evidence in the record. Thus, the Court concludes that the ALJ's evaluation of

Claimant's subjective symptoms and complaints was sufficient, and this argument of Claimant does not warrant remand.

## V.   **CONCLUSION**

For the reasons set forth above, the final decision of the Deputy Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date:  11/16/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov

Catherine Seagle
SOCIAL SECURITY ADMINISTRATION
catherine.seagle@ssa.gov